# CIRCUIT COURT OF THE CITY OF ROANOKE

City of Roanoke
Redevelopment and
Housing Authority

v.

B & B Holdings, L.L.C., et al.

November 12, 2009

Case No. CL07-1348

BY JUDGE WILLIAM D. BROADHURST

The parties are before the Court on Roanoke Redevelopment and Housing Authority's (RRHA) petition to take property owned by B & B Holdings, L.L.C. (B & B) under RRHA's eminent domain authority. RRHA alleges that the property in question is subject to its authority by virtue of its inclusion in a redevelopment scheme known as the Redevelopment Plan for the South Jefferson Redevelopment Area (Plan). B & B, on the other hand, urges that the Plan was arbitrarily and capriciously drawn and designed and did not comply with requirements of the law, and thus provides this Court with no basis for granting the requested taking.

As the party challenging the findings of fact of a housing authority, B & B carries the burden of proving its claims by clear and convincing evidence. *Bristol Redevel. & Hous. Auth. v. Denton,* 198 Va. 171, 177, 93 S.E.2d 288, 293 (1956). After having had an opportunity to consider the arguments of counsel, the testimony of witnesses, and the documentary evidence, the Court

is not persuaded that B & B has carried the burden thrust upon it. Accordingly, the Court overrules B & B's objection to the taking of its property by RRHA.

## I. *Background*

In the late 1990s, Carilion Health System (Carilion) began exploring the formation of a biomedical operation (CBI). Mr. Brian Wishneff, a former economic developer for the City of Roanoke (City), was engaged by Carilion. to define and develop the overall project in conjunction with Virginia Polytechnic Institute and State University and the University of Virginia. Once the concept was developed, he also assisted with suggestions for possible locations of the operation. In his view, certain properties in the City on and around Reserve Avenue appeared to qualify as "blighted" and thus susceptible to redevelopment and acquisition. In part due to his input, the CBI project board ultimately decided to contact City officials to explore the idea of redeveloping the area for use by CBI.

In November 1999, Ms. Darlene Burcham, the incoming City Manager, along with City staff, toured the target area as well as adjacent properties after the CBI inquiry. City officials also concluded that the area in question would likely qualify as "blighted" and determined that redevelopment of the area would be beneficial. Obviously desirous of having the CBI project located within its borders, the City approached RRHA and requested that it initiate an investigation into whether the area qualified for redevelopment due to blight. In late 1999 and the first part of 2000, the City negotiated with and entered into performance agreements with Carilion to facilitate the CBI project, contingent on the property being acquired for redevelopment by RRHA. City Council passed corresponding ordinances supporting the CBI project. The target area not only included acreage contemplated for use by CBI, but also significant acreage for additional development.

In the summer of 2000, RRHA retained the services of a number of inspectors and analysts who evaluated the conditions of properties in the study area. Mr. Gregory Poore, an expert in land planning and redevelopment, was retained to evaluate and report on whether the target area qualified for redevelopment.

Meetings were held periodically between representatives of the City, RRHA, Carilion, and some members of the evaluation team while the evaluations and inspections were underway. Ultimately, Mr. Poore submitted a report to RRHA, concluding that the vast majority of the area under consideration, including B & B's property, qualified for redevelopment and acquisition.

RRHA adopted the Plan on March 12, 2001. The City Council approved it a week later. The Plan was premised on certain findings articulated as follows:

> The problems identified in the South Jefferson Redevelopment Area include: deteriorated and dilapidated structures, deficient streets, sidewalks, and drainage, deleterious land uses, obsolete layout/faulty arrangement of design, obsolescence, flood hazards, abandoned structures, abandoned vehicles, an accumulation of debris and overgrown lots, depressed economic business activity, and a decline in the economic impacts for the City of Roanoke. The target area has been designated as a Redevelopment Area . . . with the primary goal of removing blight and blighting influences and providing for the economic and physical revitalization of the area.

Section (D) of the Plan, which lists the Plan's Goals and Objectives, states the following:

> [RRHA] in cooperation with the City has identified the South Jefferson Redevelopment Area as a high priority area owing to its economic decline, level of blight, vacancy, land use patterns, deteriorating infrastructure, environmental deficiencies, and potential economic impact of floods and associated health and safety risks.
>
> The primary goal of the Redevelopment Plan is to provide for private reinvestment and economic growth through redevelopment by private enterprise. The project will serve to foster positive economic development through a staged process of public/private redevelopment and/or rehabilitation through the entire area and along key corridors connecting to the downtown.

The Plan also listed several objectives and the following four goals:

> 1. Eliminate blight, blighting influences, deterioration and deleterious land use through redevelopment, rehabilitation, adaptive reuses, and capital improvements.

2. Improve business activity and generate additional economic value for the City of Roanoke through redevelopment of land for biotechnology and related uses.

3. Make best use of the area's location and urban character to provide for an orderly development framework.

4. Provide for a versatile mix of complementary land uses within the Redevelopment Area.

According to the Plan, 74.4% of the total land area in the South Jefferson Redevelopment Area is "either blighted and deteriorated or improperly developed or both."

Under the terms of the Plan, RRHA and B & B discussed private redevelopment by B & B of its property and the possibility of B & B redeveloping adjoining parcels, all under guidelines to be set by RRHA. These negotiations were not fruitful.

## II. *Discussion*

The thrust of B & B's attack here is that the City and Carilion first combined to identify properties that Carilion wanted to use for its CBI project and that the City and RRHA then manipulated the condemnation process to enable RRHA to wrest those properties from their owners under its power of eminent domain by claiming that the parcels were "blighted." In so doing, as B & B sees it, the City and Carilion essentially usurped eminent domain power belonging to RRHA for their benefit and to the detriment of private landowners like B & B.

The City and RRHA are not similarly situated when it comes to designating properties over which the power of eminent domain should be exercised. The law provides that a housing authority like RRHA is "a political subdivision of the Commonwealth with public and corporate powers." Va. Code Ann. § 36-19. Under its grant of power, a housing authority has:

the primary responsibility of investigating the conditions in an area proposed for redevelopment and determining whether it is a slum, blighted, or deteriorated area, is delegated to the local redevelopment authority and not to the city council. The functions of the council are to approve or disapprove the "redevelopment plan" as outlined by the authority and, if approved, to cooperate with the authority in its execution.

*Denton,* 198 Va. at 176, 93 S.E.2d at 292 (internal citations omitted).

Clearly the law puts the decision of whether an area qualifies for redevelopment in the hands of RRHA, not the City.

B & B asserts that the presence of the City in multiple meetings in the redevelopment planning shows overreaching by the City and stains the findings and conclusions reached by RRHA. Standing alone, the Court does not find that this evidence warrants such a conclusion. Given its ultimate financial stake in supporting any redevelopment project (independent of Carilion's plans), the City had a proper role in discussions and meetings about the project as the evaluation process was underway. Accordingly, its participation in the process alone does not taint the Plan.

Nonetheless, B & B produced documentary evidence of correspondence between the City Attorney's office and RRHA clearly suggesting that the City was pressuring RRHA to come up with findings that would correspond with the terms the City had reached with Carilion. There is also correspondence between RRHA's counsel and the firm doing the environmental impact studies that suggest that a sufficient proportion of the target area could be designated as "blighted" by changing the quantity of properties under review. This conduct clearly suggests to the Court that the City was responding to pressure from Carilion in trying to direct the conclusions that RRHA would reach This overreaching, coupled with the City's participation in status meetings, gives substance to B & B's accusation that the blight conditions found by RRHA did not exist.

The question then left for the Court, simply put, is whether the area was blighted or not. In resolving this question, the Court must bear in mind that the burden on B & B is great. The. Supreme Court of Virginia has described the burden as follows:

> All presumptions are in favor of the validity of the exercise of municipal power. The burden is upon one alleging the invalidity of an ordinance to establish such invalidity by clear and convincing proof. . . .
>
> *The same principles apply to the findings of fact by a redevelopment authority* to which . . . the General Assembly has delegated the primary responsibility of determining the conditions in an area and initiating the project.

*Id.* at 177, 93 S.E.2d at 293 (emphasis added) (internal citations omitted).

## A. *Blight Standard*

B & B notes first that its own property was not blighted. The Court agrees that the evidence is clear that the primary parcel that B & B owns and operates was in fine condition. That, however, does not resolve the question presented, since the law is clear that an unblighted parcel may nonetheless be taken as part of a redevelopment project if it is needed to adequately redevelop the area as a whole. As the Supreme Court has held, if an area as a whole is subject to rehabilitation, the condition of a single structure is immaterial." *Hunter v. Norfolk Redev. & Hous. Auth.*, 195 Va. 326, 339, 78 S.E.2d 893, 901 (1953); accord *Denton*, 198 Va. at 179, 93 S.E.2d at 294; *see also* Va. Code Ann. § 36-49(A).

The analysis then must turn to whether the properties in the Plan area suffered from "blight" or "blighting conditions."

B & B asserts that "blight" is primarily defined in Va. Code § 36-48, which provides in pertinent part:

> It is hereby found and declared that there exist in many communities within this Commonwealth blighted areas . . . which impair economic values and tax revenues, cause an increase in and spread of disease and crime, and constitute a menace to the health, safety, morals, and welfare of the residents of the Commonwealth. . . .

Seizing on the phrase "menace to the health, safety, morals, and welfare of the residents of the Commonwealth," B & B contends that a property's condition must constitute an imminent threat to health, safety, and welfare before it can be considered "blighted" under § 36-48.

RRHA counters that "blight" is defined not by § 36-48 but rather by Va. Code § 36-49(A)(1). That section, as it existed at the time the Plan was adopted, provides that housing authorities are empowered:

> [t]o acquire blighted or deteriorated areas, which are hereby defined as areas (including slum areas) with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement of design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community.

Comparing these two sections, the Court is satisfied that the definition of "blight" is more clearly articulated in § 36-49(A)(1). Certainly § 36-48 sets forth some of the effects of blight as perceived by the legislature. But § 36-49(A)(1) specifically uses the term "defined" in describing the land conditions that are characteristic of "blighted" properties. The Court is therefore persuaded that § 36-49(A)(1) articulates. the standard by which blight must be measured. *See Runnels v. Staunton Redev. & Hous. Auth.*, 207 Va. 407, 411, 149 S.E.2d 882, 885 (1966). Thus, the conditions of the property under consideration need only be "*detrimental* to the safety, health, morals, or welfare of the community," rather than an active and imminent "*menace* to the healthy, safety, morals and welfare." As a result, the Court finds that RRHA's witnesses, to the extent that their findings of "blight" were predicated on the definition set forth in § 36-49(1) and included in the report supporting the Plan, applied the appropriate legal standard in arriving at their conclusions.

## B. *Evidence Evaluation*

B & B presented both lay and expert witnesses who challenged the factual recitations in the RRHA report and the characterizations of the properties as "blighted." The witnesses asserted that the properties were in good condition in the main. B & B produced evidence that the street, guttering, and sidewalk conditions were not as portrayed in the report. Additional witnesses for the landowners also attacked the manner in which the Plan was adopted, urging that it was improper to do blight studies in an area where RRHA suspected blight and that the public at large was excluded from participating until too late in the process. Other experts disputed the findings of environmental threats made by RRHA inspectors and criticized the consideration of a property's location in the floodplain as a factor supporting a "blight" finding. B & B also points to Mr. Poore's inclusion and exclusion of the condition of certain properties held by the City and Norfolk Southern Corporation in his quantification of the percentage of properties contributing to blight as illustrating his manipulation of data to support a finding that 74% of the target area was blighted.

RRHA countered with its own lay and expert witnesses who supported the findings, including Mr. Poore and others who had done the actual property inspections and environmental testing. They explained the bases of their findings, including the "on ground" inspections that were performed and the bases that were relied on in reaching their conclusions.

For purposes of announcing its opinion, the Court will not attempt to recount each witness's evidence and pronounce an evaluation of the testimony of each. But certain observations must be made

The Court has before it significant conflicting opinions from highly qualified developers and planners both as to conditions on the ground as well as to factors that actually contribute to blight. Some of the opinions of B & B's experts are based on the absence of supporting documentation in the Plan, documentation that actually turns out to be present, The opinions of some others appear to be based on a stricter definition of "blight" than the law prescribes. And the conclusions of other experts are clouded by an animus toward Carilion, the secrecy surrounding the development of the CBI project by the City and Carilion, the corresponding lack of public input on the project, or some combination of all three.

On other points of contention, such as the dispute between the planners as to the weight to be given the presence of the floodplain as a factor in blight determination, the Court finds that reasonable persons could reach opposite conclusions. Given the photographic evidence showing the impact that an actual flood had on the area sixteen years earlier, coupled with a credible report of a hazardous substance release accompanying that event, the Court cannot say that Mr Poore's consideration of the presence of the floodplain in conjunction with other property conditions is unwarranted. Likewise, the difference in Mr. Poore's acreage and proportion summary of parcels categorized as substandard and the actual tables he prepared from which the summary was taken does not demand rejection of his findings. While the Court finds his after the fact explanation of the difference to be difficult to follow, the Court cannot say that it is incredible. Mr. Poore openly included the underlying tables and documentation as part of his report to RRHA for all to consider. His math aside, the documentation supports his conclusion that the majority of the Plan area suffered from blight or blighting influences even if the reported quantity was not accurate.

The Court has carefully considered the demeanor of the witnesses and the entire body of documentary and *ore tenus* evidence presented. The Court finds that, despite apparent overreaching by the City in some areas, Mr. Poore and others performing the evaluations were able to insulate themselves from any improper effect of that conduct in reporting their findings and reaching their conclusions.

It is certainly clear that the City had an interest in seeking redevelopment of an area that was acceptable to Carilion and within the boundaries of the CBI project. The Court, however, is not sufficiently persuaded that this interest drove RRHA's ultimate finding that the target area

was blighted. Instead, the Court finds that evidence existed that, if believed, justified a finding that the majority of the properties that were ultimately included in the Plan area actually suffered from blight and that this condition drove and shaped the parameters of the Plan.

Certainly the Court might have weighed that evidence differently than RRHA upon a *de novo* consideration of the matter. However, this is not a *de novo* review. The Court is not free to substitute its own findings of fact as to the condition of the properties for that of the authority "to which . . . the General Assembly has delegated the primary responsibility of determining the conditions in an area and initiating the project" except upon the force of clear and convincing proof. *Denton*, 198 Va. at 177, 93 S.E.2d at 293. So bound, the Court does not find itself persuaded by clear and convincing proof that the facts found by RRHA were invalid or that the Plan's adoption was arbitrary or capricious.

## III. *Conclusion*

For the foregoing reasons, the Court overrules B & B's objection to the taking of its property by RRHA. The parties may proceed to schedule a trial on the issue of just compensation.